IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD BUTTON, et al.,                  :
                                        :
              Plaintiffs,               :
                                        :   3:12-CV-01941
       v.                               :   (JUDGE MARIANI)
                                        :
ALAN SNELSON and                        :
DORRANCE TOWNSHIP,                      :
                                        :
              Defendants.               :

## MEMORANDUM OPINION

### I.     Introduction

Presently before the Court are Cross-Motions for Summary Judgment (Docs. 34; 39) in the above captioned civil rights action. For the reasons that follow, the Court will grant Defendants' Motion, deny Plaintiffs' Motion, and enter summary judgment on behalf of the Defendants.

### II.    Statement of Material Facts

Upon review of the submissions of record, the following facts are undisputed, unless otherwise noted.

#### a.  Permits and Approvals for the Blue Ridge Truck Stop

Plaintiffs Edward Button, Sr., and Sandra Button are a husband and wife. (*See* Defs.' Statement of Material Facts ("DSOMF"), Doc. 39-2, at ¶ 1.) The exact ownership interests between the Buttons and Plaintiff Button Oil Company, Inc. are unclear and subject to

dispute between the parties. (Cf., e.g., id. at ¶ 2; Pls.' Statement of Material Facts

("PSOMF"), Doc. 35, at ¶¶ 1-2.) However, it is clear from the record that the Plaintiffs acted

as owners and/or operators of the Blue Ridge Truck Stop in Dorrance Township,

Pennsylvania, (see, e.g., DSOMF at ¶ 6; PSOMF at ¶ 87), a business "involving the sale of

gasoline and diesel fuel" that "was typical of a gas station or truck stop, with a small

convenience store," (DSOMF at ¶ 13).

The Truck Stop opened for business on May 13, 1996. (PSOMF at ¶ 87.) In the

years before the business opened,

> [t]he Buttons applied for land development approval for a commercial development referred to as "Blue Ridge Plaza" . . . . The Subject Property received *conditional* land development plan approval [on September 3,] 1991 to operate a truck stop facility, consisting of a convenience store and gasoline pumps, on the Subject Property.

(*Id.* at ¶ 6.) However, this "land development plan approval" only encompassed "a gas

station, truck fueling stop and convenience store. It did not authorize the storage,

distribution or sale of propane." (*Id.* at ¶ 15.)

The approval was also subject to certain conditions as stated in the September 6,

1991 letter from the Township Board of Supervisors informing the Buttons of their approval.

(*See* Defs.' Appendix to Mot. for Summ. J., Doc. 39-3, at 2a-3a.) The conditions in that letter

> included (but were not limited to) obtaining an approved Erosion and Sedimentation Control Plan from the Luzerne County Conservation District or "DER" [the Pennsylvania Department of Environmental Resources, which has since been re-named the Department of Environmental Protection], a Pennsylvania Department of Transportation ("PennDOT") Highway Occupancy Permit, a wetland delineation (if certain additional "fill" material

2

would be placed on the Subject Property, and inclusion of a note so specifying on the required revised land development plan), the submission of stormwater runoff calculations to the Township, and securing all related permitting, as well as installation of a guide rail and rip rap (stone) at the outlet of a CMP (corrugated metal pipe) near a state highway route. The *conditional* land development plan approval correspondence additionally specified that "[n]o other structures or improvements are allowed without Township approval."

(DSOMF at ¶ 8 (citing Defs.' Appendix at 3a) (internal footnote and citations omitted).)[1]

Defendants aver that, prior to initiating this lawsuit, Plaintiffs never fulfilled all of the listed conditions. (*Id.* at ¶ 14.) Plaintiffs deny this, (Pls.' Answ. to DSOMF at ¶ 14), though both Edward and Sandra Button admitted in their depositions that they did not receive the required Highway Occupancy Permits, (*see* Edward Button, Sr. Dep., Feb. 17, 2014, Doc. 39-3, at 17:25-18:8; Sandra Button Dep., Feb. 17, 2014, Doc. 39-3, at 11:24-12:6). Plaintiffs further admit that it was not until 2014 that they filed for a Highway Occupancy Permit, which was approved by PennDOT on October 9, 2014 and finalized and recorded as part of Plaintiffs' Land Development Approval on December 5, 2014. (DSOMF at ¶¶ 10-12; Pls.' Answ. to DSMOF at ¶¶ 10-12.) By point of comparison, the Plaintiffs filed their Complaint in this action on September 27, 2012.

Likewise, the parties agree that "[a]pproval of an Erosion and Sediment Pollution Control Plan, a condition of [Plaintiffs'] 1991 Land Development Plan approval, was not obtained from the Pennsylvania Department of Environmental Protection ('PADEP') until

---

[1] Plaintiffs deny this averment on the ground that the correspondence referenced is a writing that speaks for itself. (Pls.' Answ. to DSOMF, Doc. 42, at ¶ 8.) The Court agrees that the writing speaks for itself, but it says precisely what the Defendants represent that it says. Therefore, we consider the quoted language as not in reasonable dispute.

July 28, 2011," (DSOMF at ¶ 19), and that "[t]he required permit from the Pennsylvania Department of Labor & Industry for the intended use of the Subject Property for propane storage and distribution was not received until May 4, 2010 (with subsequent renewals or additional permits issued thereafter)," (*id.* at ¶ 20.)

The Township finally provided "[l]and development approval for truck stop activities, as well as for bulk storage and distribution of propane" on May 12, 2014. (DSOMF at ¶ 21; Defs.' Appendix at 61a.) While Plaintiffs admit that approval was given on that day, they argue that the 1991 approval already authorized their activities and that they only submitted this second development plan in connection with their application for a Highway Occupancy permit. (Pls.' Answ. to DSOMF at ¶ 21.) Nonetheless, they admit that "[t]he first official recording of an approved land development plan for the Subject Property occurred on May 22, 2014 (twenty months *after* the filing of the Complaint)." (DSOMF at ¶ 25; Pls.' Answ. to DSOMF at ¶ 25.)

### b. Alan Snelson's Enforcement Actions

Plaintiffs' business existed for a long period of time without obtaining all the permits and approvals listed in their 1991 land development approval. These issues nonetheless remained dormant for many years, only to come to a head in the late 2000s.

The catalyst was Dorrance Township's decision to hire one Alan Snelson as Zoning Officer on a part-time basis around 2007. (*See* DSOMF at ¶ 22.) "Snelson's duties as the Dorrance Township Zoning Officer include implementing the Zoning Ordinance and

4

Subdivision and Land Development Ordinance that are in effect in Dorrance Township."
(PSOMF at ¶ 6.) The parties agree that "Dorrance Township did not require Snelson to have
any type of certification to become its Zoning Officer." (*Id.* at ¶ 5.)

"In the fall of 2010, Plaintiffs applied to Dorrance Township for a zoning permit to
erect a fence to enclose a portion of the Subject Property not then devoted to the
convenience store or gasoline service station use." (DSOMF at ¶ 26.) "No further
explanation was given, although Snelson, in examining the property before issuing the
permit, saw that a variety of machinery and equipment was located in the area to be fenced
in, and assumed that was the purpose of the fence enclosure." (*Id.* at ¶ 27.) Snelson's
assumption was mistaken. In fact, "[t]he fence was merely the enclosure of a proposed bulk
[propane] storage facility as the principal use to be made of the fenced in area." (*Id.* at ¶ 28.)
It has been Snelson's position throughout this lawsuit that the propane usage is subject to
land use regulations that require approval beyond what the Buttons had already obtained.

After discovering the Buttons' actual intention for the fenced-in area, Snelson sent
them a letter on November 18, 2010 with the subject line "RE: Cease and Desist Order."
(*See* Defs.' Appendix at 4a.) That letter purports to provide a list of items that must be
addressed to obtain compliance with a Cease and Desist Order that Snelson claimed he
issued on November 16, 2010, but which was not included in the summary judgment record.
(*Id.*) The November 18 letter begins:

> You have not received any approval for the operation of a propane installation
> from Dorrance Township. Therefore within 5 days; remove any and all

5

propane containers that have been filled with propane at any time. Furthermore, you are not authorized to bring any equipment and or [sic] devices that may contain propane into this location until approval is granted by Dorrance Township. This does not include a new tank that has never been filled or contains any propane nor does it include a delivery truck that may have propane remaining at the end of the delivery day. If you are interested in continuing with establishing a propane installation, I suggest that you apply for the appropriate approvals and or [sic] permits as required by the Dorrance Township Zoning Ordinance(s) and the Dorrance Township Sub Division and Land Development Ordinance.

(Id.) It then instructed the Buttons, within fifteen days, to apply for "building permit(s) for any and all electrical connections and/or other infrastructure you have made in order to support the application made to the Bureau of Occupational and Industrial Safety for the propane installation" and to "provide any and all documentation regarding the approvals that have been granted for the operations being conducted at the 'storage building' located at [the Subject Property]," such as an approved Land Development Plan or, in the absence of such a Plan, a detailed description of what activities occur at the Property. (Id. at 4a-5a.) It concluded with a warning that Snelson may institute a civil enforcement action if the Buttons' noncompliance continues. (Id. at 5a.)

Snelson later testified that he initiated this correspondence "because Plaintiffs were not 'authorized to bring any equipment or devices that may contain propane into this location until approval is granted by Dorrance Township. There was no zoning permit issued for such activity.'" (PSOMF at ¶ 16 (quoting Alan Snelson Dep., Jan. 14, 2014, Doc. 37, at 28:9-13).) "Snelson testified that he 'probably consulted' with [then-Dorrance Township Solicitor James A.] Schneider prior to sending the correspondence." (Id. at ¶ 12 (quoting

Snelson Dep. at 25:16-19).) However, "Attorney Schneider testified that[] he did not prepare

the correspondence, dated November 18, 2010; that[] Snelson did not ask him to prepare it;

and that[] he was not consulted in any way regarding the preparation or mailing of the

correspondence." (Id. at ¶ 13 (citing James Schneider Dep., Jun. 5, 2014, Doc. 37, at 17:21-

18:14).)

Plaintiffs' attorney at the time, John G. Dean, sent a reply letter to Snelson on

November 22, 2010. (See id. at ¶ 19.) That letter stated Attorney Dean's opinion that the

Buttons "are in compliance with [Snelson's cease and desist letter] as well as the Dorrance

Township Zoning Ordinance." (Defs.' Appendix at 7a.) Dean further wrote:

> [I]t is my understanding that the property at issue . . . is in a B-2 zoning
> district. . . . As you are aware, a permitted use in a B-2 zoning district is
> "[c]onvience [sic] Stores with Gas Sales" and "[a]ccessory use to the above"
> (emphasis added). I also note that B-2 uses permitted by special exception
> include "[o]utdoor storage (commercial)." As you also know, in February 2010,
> you issued a zoning permit for an enclosure fence for the purposes of storing
> trucks and equipment.

(Id. at 6a.) Dean also asserted that "the fence referenced is enclosing empty propane tanks

and a delivery truck." (Id.) Therefore, he argued that the Buttons' use of their property

complied with the standards set forth in Snelson's November 18 letter and also with the

relevant portions of the Township Zoning Ordinance. (See id. at 6a-7a.)

"Thereafter, Snelson sent a multitude of mail and email letters, either to the Buttons

directly, or to Dean, advising of his reasoning with regard to" his opinions that the Buttons

needed further zoning and land development approvals for the operation of a bulk propane

7

storage and distribution business on their property, as well as other ancillary permits and approvals. (DSOMF at ¶ 34.)

The first such letter is dated January 11, 2011, from Snelson to the Buttons. (*See* Defs.' Appendix at 9a.) There, Snelson gave an overview of events since he issued his November 18 letter. (*See id.*) He stated that all efforts to communicate with the Buttons and their attorney had failed and that the Buttons had not taken any steps to comply with the demands in the November 18 letter or the Cease and Desist Order. (*Id.* at 9a-10a.) Further, "Snelson requested that the Buttons prepare a sketch plan for discussion at the Dorrance Township Planning Commission Meeting on January 31, 2011, to explain how they intended to comply with the requirements of the Dorrance Township Subdivision and Land Development Ordinance ('SALDO')." (DSOMF at ¶ 38; Defs.' Appendix at 10a.) As before, Snelson testified that he "probably" consulted with someone before issuing the January 11 letter, but Attorney Schneider denies discussing it with Snelson or assisting him in any way, and "testified that[] he doesn't believe that Snelson ever asked him the proper method of issuing a cease and desist order." (PSOMF at ¶¶ 23-25.)[2] However, Attorney Schneider did testify that "he advised Snelson that it 'would be more appropriate for him to get permission from the Board of Supervisors, or at least bring it before the Board of Supervisors' before he issued a Cease and Desist Order." (*Id.* at ¶ 26.)

---

[2] Schneider testified that the same lack of communication with Snelson persisted with regard to the March 9 and May 3 letters, discussed *infra*. (*See* PSOMF at ¶¶ 33-34, 38-39.)

"In response, the Buttons submitted a hand-drawn diagram they prepared themselves, and engaged in a brief discussion with the Township Planning Commission . . . ." (DSOMF at ¶ 39.) However, "Edward Button, Jr. walked out of the meeting, stating that Plaintiffs would not make formal application for land development plan approval for the proposed propane use," (id.), which was consistent with the Buttons' opinion that further permits and approvals were unnecessary, (see Pls.' Answ. to DSOMF at ¶ 39).

Attorney Dean replied to Snelson's letter, also on January 11. (See Defs.' Appendix at 24a-25a.) In that correspondence, "Dean continued to assert that 'no variance is necessary' for the proposed propane usage." (DSOMF at ¶ 40 (citing Defs.' Appendix at 24a-25a).) Snelson replied to Dean's letter on January 13 and insisted that the Buttons had not in fact received the necessary permits and approvals. (Defs.' Appendix at 57a-58a.) An email to the Buttons and Dean dated January 18, 2011 reflects that the parties met that day to discuss these points of disagreement." (Id. at 59a.)

The next correspondence of record comes in the form of a letter from Snelson to the Buttons on March 9, 2011. (See id. at 13a.) That letter again reiterated Snelson's belief that the Buttons remained in noncompliance with his Cease and Desist Order. (Id.) The letter concluded:

> Therefore enforcement activity, as authorized in Section 1304 of the Dorrance Township Zoning Ordinance, will commence and will indicate that there have been 113 days that violations of the have [sic] occurred (November 16, 2010 to March 9, 2011). Finally, each day after this letter will also be added to the ongoing violation by subsequent filings at the District Justice office.

9

(*Id.*)

Apparently receiving no response, Snelson issued an "Enforcement Notice" on May

3, 2011. (*Id.* at 14a.) In that Notice, Snelson stated that the "final effort to resolve this

matter" had failed when the Buttons neglected to inform him "how [they] intend to comply

with the [Dorrance Township zoning] ordinance" as they had agreed to do during an April 7

meeting. (*Id.* at 15a-16a.) Thus, he wrote that "I am notifying you that it is the intent of

Dorrance Township to take legal action against you both for the violations which you have

permitted at [the Subject Property]." (*Id.* at 14a.) He identified the specific violations as:

A. Failure to comply with Section 301 of the Dorrance Township Ordinance, which requires compliance with all applicable provisions and regulations of the ordinance[;]

B. Failure to comply with Section 315 of the Dorrance Township Ordinance, which requires approval under the applicable provisions of the Dorrance Township Sub Division and Land Development Ordinance (SALDO)[;]

C. Failure to comply with Section 506.2 of the Dorrance Township Ordinance, which allows for use of property in a B-2 Highway Business District, the zoning district of [the Subject] location, only after it has been permitted by special exception[; and]

D. Failure to comply with Section 103 of the Dorrance Township Sub Division and Land Development Ordinance which requires compliance with all provisions of the SALDO.

(*Id.* at 15a.) The Notice concluded by remarking that

the Dorrance Township Planning Commission will meet on May 23, 2011. You will need to have the information submitted for inclusion on the agenda by May 9, 2011. The Dorrance Township Supervisors meet on June 6, 2011 at which time approval of the Land Development Application could be granted thereby obtaining compliance.

10

(*Id.* at 16a.) It further informed the Buttons that they "have the right to appeal this enforcement notice to the Dorrance Township Zoning Hearing Board." (*Id.*)

Next, perceiving an "obvious intent" of the Buttons "to advance [their purportedly unauthorized] project by the installation of a propane tank foundation without obtaining a zoning permit," on July 14, 2011 Snelson sent a nearly identical Enforcement Notice alleging the same violations, informing them of the Township's intent to take legal action, and further informing them of their appellate rights. (*See* Defs.' Appendix at 74a-75a.) But the Buttons "did not avail themselves of the steps suggested by Snelson regarding the compliance process. That is, they did not file a land development plan application, and did not appeal to the Zoning Hearing Board from the Enforcement Notice." (DSOMF at ¶ 50.)[3]

The Buttons did file an application for a zoning variance for the activities taking place on their property on June 23, 2011. (*See* DSOMF at ¶ 53 (citing Defs.' Appendix at 71a-73a).)[4] The Zoning Hearing Board, in a decision on August 30, 2011, "determined that a *zoning* variance was not necessary, as the Plaintiffs' use of the Subject Property was a valid, non-conforming use." (*See id.* at ¶¶ 59-60.) In a September 14, 2011 letter, Attorney

---

[3] Plaintiffs deny this averment, but only on the grounds that they already obtained all necessary approvals at the time Snelson issued his letter and that Snelson lacked authority to institute these enforcement proceedings. (*See* Pls.' Answ. to DSOMF at ¶ 50.) But even if Plaintiffs are correct, these assertions have no bearing on the factual statement that they did not follow the steps that Snelson suggested in his letter. Thus, we do not deem Defendants' factual assertion denied.

[4] Plaintiff deny this averment. (*See* Pls.' Answ. to DSOMF at ¶ 53.) However, they later admit that a decision on the claimed application for a variance took place, (*see id.* at ¶¶ 59-60), and even rely on this decision as a sword to attack Snelson's decision to continue to pursue legal remedies after the Board's decision was issued, (*see* Pls.' Br. in Supp. of Mot. for Summ. J., Doc. 36, at 12). Thus, it is clear from Plaintiffs' own admissions, as well as the cited portions of the record, that the asserted application must have been filed.

John Dean stated that "[i]n light of the fact that the Dorrance Township Zoning Hearing unanimously ruled that my clients do not need a zoning variance," they do not understand Snelson's position that further "'zoning permits' would be required." (Defs. Appendix at 77a.) Snelson responded by an email demonstrating his intent to pursue enforcement remedies by stating that the necessary permits were already listed in his "May 4,[5] 2011 Enforcement Notice." (*Id.* at 78a.)

On October 5, 2011, "Township Secretary Pat Davis submitted an invoice to Buttons for the costs of the zoning hearing, including Township legal expenses and 'administrative overhead.'" (DSOMF at ¶ 69 (citing Defs.' Appendix at 81a-91a).) "Ms. Davis' submission to Plaintiffs apparently included time expended by Township Solicitor Schneider, who failed to distinguish between time involved in the Zoning Hearing Board proceeding and his services related to the land development application." (*Id.* at ¶ 70.) The purpose of this correspondence "was to recoup Dorrance Township's 'necessary administrative overhead' with regard to the Hearings held by the Dorrance Township Zoning Hearing Board." (PSOMF at ¶ 56.)

"Meanwhile, the Buttons continued to perform the work to complete the installation of the bulk propane storage facility." (DSOMF at ¶ 65.) "As a result, Snelson issued a third Enforcement Notice on September 22, 2011." (*Id.* at ¶ 66 (citing Defs.' Appendix at 79a-80a).) The Notice purported to be a "third Enforcement Notice for the installation of a

---

[5] *Sic*: it is assumed that Snelson meant to refer to the *May 3* correspondence, discussed at page 10, *supra*.

propane tank (30,000 gallon vessel) on a concrete foundation" which "has begun and continued to be developed without obtaining any permits or approvals from Dorrance Township." (Defs.' Appendix at 79a.) The letter again listed the same violations of the Township *Land Development Ordinance* (but omitted the violations of the Zoning Ordinance that had been listed before the Zoning Hearing Board decision), threatened further enforcement remedies, and informed the Buttons of their appellate rights. (*Id.* at 79a-80a.)

Only on "October 31, 2011, some eleven (11) months after being requested by Snelson to do so," did Plaintiffs file "a *land development* application with Dorrance Township." (DSOMF at ¶ 72 (citing *id.* at 93a-95a).)

Snelson wrote to the Dorrance Township Board of Supervisors on December 13, 2011 and requested[6] that the Hearing Board "include the denial of this application on your agenda for the" meeting scheduled for January 3, 2012. (Defs.' Appendix at 96a; *cf. also* PSOMF at ¶ 57; DSOMF at ¶ 74.) Ultimately, the Board decided otherwise. The land development application "was approved in the spring of 2014 and recorded with the Luzerne County Recorder of Deeds on May 22, 2014." (DSOMF at ¶ 83 (citing Defs.' Appendix at 60a-61a).)

---

[6] The parties dispute whether Snelson "requested" this or "recommended" it. (*Compare* PSOMF at ¶ 57 *with* Defs.' Answ. to PSOMF, Doc. 41-2, at ¶ 57.) The Court attaches no significance to this word choice.

### c. Snelson Files a Civil Action in State Court

While all of the above approval processes were ongoing, on June 7, 2011 Snelson

initiated another lawsuit, captioned *Dorrance Township Zoning Officer v. Edward and Sandy*

*Button*, in Pennsylvania state court. (PSOMF at ¶ 41; Pls.' Appendix to Mot. for Summ. J.,

Doc. 37, at 31a.) Again, though Snelson testified that he consulted with Attorney Schneider

before filing this action, Schneider testified that Snelson never consulted with him about it.

(*See* Schneider Dep. at 27:19-29:23.)

Schneider further testified that if he had seen the Complaint before Snelson filed it,

he "would never allow [it] to be filed," because the Township Zoning Officer does not have

standing to file a civil action with himself as the named plaintiff. (*See id.* at 29:13-17.)[7] The

Complaint alleged that the Buttons had failed to receive all appropriate permits and land

development approvals for their property. (*See* Pls.' Appendix at 32a.) It sought $12,000 in

damages, which reflected 197 days of ongoing zoning violations, and "court costs" of $161.

(*Id.* at 33a.) Snelson does not fully explain how he arrived at $12,000 figure. He only stated

that he was authorized to seek $500 per day (or $98,500 total), but, finding this too high, he

---

[7] The parties dispute whether Schneider's understanding of the civil action is accurate. (*See* Defs.'
Answ. to PSOMF at ¶ 45 ("In fact, [Schneider] apparently believed that the Civil Complaint that was filed
identified Mr. Snelson as the plaintiff. He was not the Plaintiff. The Township was the plaintiff in the
proceeding, and it does have standing to file a civil action in order to enforce land use regulations, pursuant
to Pennsylvania law."). This confusion is understandable; the Complaint, as drafted by Snelson, a non-
lawyer, uses ambiguous terminology. Thus, the cover sheet lists "Dorrance Township Zoning Officer" as the
Plaintiff, which supports Schneider's interpretation. (*See* Pls.' Appendix at 31a.) By contrast, the body of the
Complaint characterizes "Dorrance Township" as the Plaintiff. (*See id.* at 32a.) The Court takes no position
on which interpretation is correct, but only recounts Schneider's testimony for purposes of developing a
complete record.

14

chose the $12,000 figure instead. (See Snelson Dep. at 67:13-72:9.) The Complaint also

sought additional costs (and $15,000 instead of $12,000 in damages), but these were

physically crossed out in the Complaint that Snelson submitted. (See Pls.' Appendix at 33a.)

Snelson testified that he crossed out these sections on Schneider's advice, thus

contradicting Schneider's testimony that he did not aid in drafting this Complaint. (See

Snelson Dep. at 67:13-68:18, 72:10-18.)

A hearing was conducted on Snelson's Complaint on January 19, 2012. (DSOMF at

¶ 76.) Attorney Schneider did not attend the hearing. (Id. at ¶ 78.)[8] It is unclear why

Schneider did not attend the hearing: while Snelson testified that "he expected Attorney

Schneider to be at the Hearing," Schneider testified that "Snelson never asked him to

attend" it. (PSOMF at ¶¶ 60-61.)

After the hearing, "on February 7, 2012, Snelson directed an ex parte

correspondence to the attention of [the presiding judge,] Magisterial District Judge Ronald

W. Swank." (Id. at ¶ 62.) Snelson's expressed intent in sending this correspondence was to

"wrap-up . . . what was said at the hearing." (Id. at ¶ 65 (quoting Snelson Dep. at 95:6-8).)

He did not copy Attorney Dean on this correspondence, and, indeed, sent copies to no one

beyond Judge Swank himself. (See id. at ¶ 66.) Snelson appears ignorant of the impropriety

of such action; in his deposition, when asked why "[t]his was just sent to Judge Swank and

---

[8] Plaintiffs deny this averment. (Pls.' Answ. to DSOMF at ¶ 78.) However, their "denial" relies on extraneous material not relevant to the simple question of whether Schneider was physically present at the January 19 hearing. (See id.) Indeed, Plaintiffs' own Statement of Material Facts avers that "Attorney Schneider did not attend the Hearing held on January 19, 2012, before Magisterial District Judge Ronald W. Swank." (PSOMF at ¶ 59.)

no one else" he responded, "Who else would I copy on it? I'm sending it to the Magistrate."

(Snelson Dep. at 93:21-94:2.) When asked again why he did not send opposing counsel a

copy of his letter, he answered, "Why? Because I didn't. I mean, no reason. I just didn't." (*Id.*

at 94:9-24.)  For his own part, "Attorney Schneider testified that[] he did not compose the *ex*

*parte* correspondence . . . and that[] he did not know about it until 'sometime subsequent.'"

(PSOMF at ¶ 63 (quoting Schneider Dep. at 32:9-12).) He further expressed disapproval of

this *ex parte* communication, stating: "If I had know about this, I would have advised

strongly against it, strongly, because I think it's totally inappropriate." (*Id.* at ¶ 64 (quoting

Schneider Dep. at 32:5-8).)

Among other things, Snelson's *ex parte* correspondence requested various damage

awards, as follows:

- "$340.00, for 'Application for Land Development Approval' by reason that it
  was an 'avoided cost' that the Buttons had 'achieved by the persistent
  noncompliance,'" (*id.* at ¶ 70);

- "$300.00 for Application for a Zoning Permit for the Commercial Use of the
  Property" for the same reason as above, (*id.* at ¶ 71);

- "2,126.00 for 'legal support and consultation from the Dorrance Township
  Solicitor,'" (*id.* at ¶ 72), though the actual Solicitor, James Schneider, testified

later that he had never sought reimbursement of his own fees before in a proceeding such as this, (*id.* at ¶ 83);[9]

- "2,650.00, for 'all of the hours' that he [Snelson] had worked on the case" despite the fact that he did this work in his capacity a salaried employee, (*id.* at ¶ 73);

- "1,000.00 as 'a deterrent for future violations,'" (*id.* at ¶ 75), despite the fact that such "deterrence" damages are not permitted under the Dorrance Township Zoning Ordinance, (*id.* at ¶ 76); and

- "a 'punitive fee' in the amount of $1,000.00," (*id.* at ¶ 78).

Ultimately, "[t]he Magistrate dismissed the Township's civil action, stating as grounds Default Judgment for the Defendants." (DSOMF at ¶ 81.) No further explanation of the Magistrate's decision appears on the record. (*See generally* Defs.' Appendix at 104a-05a.) "Attorney Schneider advised Snelson not to appeal the Decision . . . ." (PSOMF at ¶ 80.)[10]

### d. Other Incidents to Show Snelson's Bad Behavior

As discussed below, in order to succeed in this section 1983 action, the Plaintiffs must show that Snelson's actions were not merely wrong but reach such a level of

---

[9] Defendants deny this averment. However, their denial admits that Schneider so testified. It only disputes whether his testimony establishes this as a fact and disputes the truth of Schneider's apparent legal conclusion that such a request for fees is impermissible. (*See* Defs.' Answ. to PSOMF at ¶¶ 83-84 (citing 53 Pa. Cons. Stat. Ann. §§ 10503(1), 10107, 10617.2).)

[10] Defendants deny this, but then, somewhat anomalously, state: "To the contrary, Mr. Snelson testified that Mr. Schneider advised the Dorrance Township Board of Supervisors not to appeal the decision of Magisterial District Judge Ronald W. Swank." (Defs.' Answ. to PSOMF at ¶ 80.) It appears that their only dispute is whether "this was good advice." (*See id.*) However, the record shows that Mr. Schneider did so advise Snelson, so we consider this averment not reasonably disputed.

culpability as to "shock the conscience." The evidence supporting such a proposition is, however, threadbare. Thus, the parties agree that Attorney Schneider testified that Snelson "want[ed] to close [Button Oil] down." (PSOMF at ¶ 81.) They also agree that Attorney Schneider testified that Schneider was "very concerned about . . . the appropriateness" of the materials that Snelson wanted to introduce into the zoning board hearing. (*Id.* at ¶ 82 (quoting Schneider Dep at 69:24-70:17.) To that end, Schneider also testified that Snelson was a "very insistent person, very insistent, persevering person" in his mission to ensure that Schneider would introduce evidence at the hearing despite Schneider's professional objections. (Schneider Dep. at 70:15-25.)

Sandra Button also testified that "Snelson appeared at Plaintiffs' place of business and indicated to Plaintiffs' employees that[] he could shut them down." (PSOMF at ¶ 90.)[11] Mrs. Button explained that shortly after a meeting with the Township, Snelson

> [w]ent into the store, told my girls [i.e., the store employees] . . . that we are so in the wrong, he could shut us down, whatever, and so I had to go down for the day and try to pull everything back together because the girls were quite upset. Trust me, the words that came out of those girls' mouths about him . . . .

(Sandra Button Dep. at 24:24-25:7.) Edward Button, Sr. testified to the same, noting that Snelson indicated to his store clerk, Diane Gross, that the business "was not in compliance and should be closed." (Edward Button, Sr. Dep. at 62:2-63:8.) The parties agree that "Dorrance Township Supervisor[] Ben Ostrowski directed Snelson to return to Plaintiffs'

---

[11] The Court recognizes that Defendants dispute the accuracy of Mrs. Button's testimony. We recount it here only to give the most complete picture of the background of this case.

place of business and apologize for his actions, which he did." (PSOMF at ¶ 91.) Edward

Button testified that these were the only two times that Snelson ever entered the store: once

to confront the store clerks and once again to apologize. (Edward Button, Sr. Dep. at 62:2-

13.) During another meeting, Sandra Button testified that Snelson spoke rudely to her when,

having been presented "with the land development plan from 1991, Snelson told her, 'This

means nothing. See this new book?[12] It draws a line in the sand. You're starting over'" and

told her that non-permitted uses of the property could not be "grandfathered in." (PSOMF at

¶¶ 88-89 (quoting Sandra Button Dep. at 19:13-20:5).)

Finally, Plaintiffs cite the testimony of William James, a boiler inspector with the

Pennsylvania Department of Labor and Industry, who also inspects propane tanks. (*See*

PSOMF at ¶ 96; William James Dep., May 9, 2014, Doc. 37, at 12:1-19.) James "has been

familiar with Button Oil Co., Inc. for a period of approximately 17 ½ [years], since he started

his position of employment;" was present on the premises for propane inspections "probably

six times;" and, in his most recent inspection of the Plaintiffs premises, "gave them a pass."

(PSOMF at ¶¶ 98-99 (citing James Dep. at 20:24-21:1, 22:13-16).) It is unclear what

relevance this has, given that Snelson's dispute with the Buttons concerned zoning

violations, not the results of safety inspections. However, perhaps showing some level of

overzealous enforcement, Snelson telephoned James to ask him about the relevant

regulations and their relation to the Plaintiffs' premises. (*Id.* at ¶¶ 103-04.) The parties agree

---

[12] It is not clear from the testimony which book Snelson allegedly referred to.

that Snelson telephoned James three times, though they do not agree on the substance of

the three discussions. (*See id.* at ¶ 105; Defs.' Answ. to DSOMF at ¶ 105.) This was

unusual because James testified that

> I have no dealings with zoning other than, you know, with the propane.
> There's no reason for us to get involved in zoning. We don't do zoning. And I
> normally don't normally talk to zoning officers. It's really a—I think he was the
> first one I've ever spoken to in 17 ½ years.

(James Dep. at 25:25-26:5; PSOMF at ¶ 106.)

### III.   Standard of Review

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, .

. . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 3188, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose

summary judgment simply on the basis of the pleadings, or on conclusory statements that a

factual issue exists. *Anderson,* 477 U.S. at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

## IV. Analysis

Plaintiffs Edward Button Sr., Sandra Button, and Button Oil filed a Complaint in this matter on September 27, 2012 against Alan Snelson and Dorrance Township. (*See* Compl., Doc. 1.) The Complaint alleges a single cause of action, styled "Fourteenth Amendment Claims," which seeks recovery against Snelson for violations of the Plaintiffs' Fourteenth Amendment procedural and substantive Due Process rights pursuant to 42 U.S.C. § 1983. (*Id.* at ¶¶ 36-40.) The Complaint does not explain the basis of Dorrance Township's liability.

The Court now turns to the merits of these claims.

### a. Claim against Snelson

#### i. Section 1983

"Section 1983, enacted as part of the Civil Rights Act of 1871, establishes 'a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights.'" *McCurdy v. Dodd*, 352 F.3d 820, 825 (3d Cir. 2003) (quoting *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258, 101 S. Ct. 2748, 2755, 69 L. Ed. 2d 616 (1981)). "A *prima facie* case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Groman v. Twp. Of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). "Notwithstanding its broad language section 1983 does not create substantive rights; rather it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003).

#### ii. The Nature of Plaintiffs' Due Process Claim

As an initial matter, there is confusion as to which Constitutional provision the Plaintiffs intend to rely on: the procedural Due Process Clause or the substantive Due Process Clause. The Supreme Court has explained the distinction between the two as follows:

> We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, *see, e.g.,*

22

> *Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S. Ct. 1983, 1995, 32 L. Ed. 2d 556
> (1972) (the procedural due process guarantee protects against "arbitrary
> takings"), or in the exercise of power without any reasonable justification in
> the service of a legitimate governmental objective, *see, e.g.*, *Daniels v.
> Williams*, 474 U.S. [327,] 331, 106 S. Ct. [662,] 664[, 88 L. Ed. 2d 662 (1986)
> (the substantive due process guarantee protects against government power
> arbitrarily and oppressively exercised).

*Cnty. of Sacramento v. Lewis*, 523 U.S. 845-46, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043

(1998). The undersigned previously had occasion to add to this analysis:

> Thus, to the extent that Plaintiff challenges the procedures by which she was
> allegedly deprived of her property interests, she raises a procedural due
> process claim. On the other hand, to the extent that she alleges that the
> Defendants used government power "for the purposes of oppression,"
> regardless of the fairness of the procedures by which they used it, *see
> Daniels*, 474 U.S. at 331, 106 S. Ct. 665, she states a substantive due
> process claim.

*Fanti v. Weinstock*, Civ. No. 11-1077, 2014 WL 5586348, at *5 (M.D. Pa. Nov. 3, 2014), *aff'd*,

___ Fed. App'x ___, 2015 WL 5915962 (3d Cir. 2015).

Though the Complaint alleges both procedural and substantive Due Process claims,

Plaintiffs' Brief in Support of their Motion for Summary Judgment only makes substantive

Due Process arguments. (*See generally* Pls.' Br. in Supp. at 8-17.) They describe the case

as one in which "Snelson, essentially, took the law into his own hands and substituted his

own rules for the criteria of law," (*id.* at 8), by wantonly seeking to close Plaintiffs' business

and forcing them to comply with unnecessary and legally impermissible land use

procedures when all of their operations were already compliant with the necessary rules and

regulations. These claims fit the *Lewis* Court's definition of a substantive Due Process claim

23

that challenges "the exercise of power without any reasonable justification in the service of a

legitimate governmental objective." *Lewis*, 523 U.S. at 846.

Nor do we even understand how a procedural Due Process claim *could* be asserted

under these facts. "At the core of procedural due process jurisprudence is the right to

advance notice of significant deprivations of liberty or property and to a meaningful

opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) (collecting

cases). "As such the focus in procedural due process claims is on the adequacy of the

remedial procedure, and not on the government's actual actions that allegedly deprived the

individual of his liberty or property interest." *K.S.S. v. Montgomery Cnty. Bd. of Comm'rs*,

871 F. Supp. 2d 389, 397-98 (E.D. Pa. 2012).

> In procedural due process claims, the deprivation by state action of a
> constitutionally protected interest in "life, liberty, or property" is not in itself
> unconstitutional; what is unconstitutional is the deprivation of such an interest
> *without due process of law*. *Parratt* [*v. Taylor*], 451 U.S.[ 527,] 537, 101 S. Ct.[
> 1908,] 1913[, 68 L. Ed. 2d 420 (1981)]; *Carey v. Piphus*, 435 U.S. 247, 259,
> 98 S. Ct. 1042, 1050, 55 L. Ed. 2d 252 (1978) ("Procedural due process rules
> are meant to protect persons not from the deprivation, but from the mistaken
> or unjustified deprivation of life, liberty, or property"). The constitutional
> violation actionable under § 1983 is not complete when the deprivation
> occurs; it is not complete unless and until the State fails to provide due
> process. Therefore, to determine whether a constitutional violation has
> occurred, it is necessary to ask what process the State provided, and whether
> it was constitutionally adequate. This inquiry would examine the procedural
> safeguards built into the statutory or administrative procedure of effecting the
> deprivation, and any remedies for erroneous deprivations provided by statute
> or tort law.

*Zinermon v. Burch*, 494 U.S. 113, 125-26, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990).

The Buttons do not contend here that the government violated their rights by failing to provide them with adequate procedures to remedy any deprivation that Snelson might have inflicted. Except for one peripheral argument discussed and rejected below, they do not describe defects in any existing procedures or explain what procedures should have been—but were not—offered. Their entire claim is that Snelson wielded government power oppressively against them. While this may state a valid substantive Due Process claim, it does not fit the established legal mold for procedural Due Process.

Therefore, the Court considers this case to be one of substantive Due Process rights only.

### iii.   Substantive Due Process Rights

A claim for a violation of the substantive due process clause may lie when a government official engages in "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Lewis*, 523 U.S. at 840. "To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

As to the first prong of this standard, "ownership is a property interest worthy of substantive due process protection." *Id.* (quoting *DeBlasio v. Zoning Bd. of Adjustment for*

25

*Twp. of W. Amwell*, 53 F.3d 592, 600 (3d Cir. 1995)). Thus, Plaintiffs' interest in their own business is protected by the substantive Due Process Clause.

However, Plaintiffs' claim against Snelson founders when it comes to the "shocks the conscience" standard. Zoning and other land-use decisions are typically "matters of local concern" that "should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives." *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 402 (3d Cir. 2003). In these cases the "shocks the conscience standard" prevents federal courts "from being cast in the role of a 'zoning board of appeals.'" *Id.* (quoting *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)).

"The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). Nonetheless, in general terms, the Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" and therefore qualify as conscience-shocking. *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129, 112 S. Ct. 1061, 1071, 117 L. Ed. 2d 261 (1992)).

Upon review of the record, we find nothing to create a triable issue of material fact that Snelson's conduct comes anywhere close to meeting these high standards. Rather, this case presents all the hallmarks of an (admittedly sometimes contentious) zoning dispute

that should be resolved at the local, and not federal, level. A discussion of Plaintiffs' alleged "conscience-shocking" conduct will illustrate this point.

### 1. Enforcing the Township Ordinances

First—and most importantly—many of the issues in this case arise out of confusion concerning the overlap and the relationships between zoning board approval, land development approval, and the outcomes of the civil action that Snelson filed. Once this confusion is dispelled, the Court sees nothing wrong with any of Snelson's actions.

Preliminarily, Plaintiffs make much of the assertion that, since 1991 their business "continued to operate, without interruption or violations, until Snelson was appointed as the Zoning Officer and determined that he was vested with the authority to regulate Plaintiffs' business." (Pls.' Br. in Opp. to Defs.' Mot. for Summ. J., Doc. 43, at 15.) But at the same time, as discussed in Section II, *supra*, Plaintiffs admit Defendants' averment that "[t]he land development plan approval of September 16, 1991 was for . . . a gas station, truck fueling stop and convenience store. It did not authorize the storage, distribution or sale of propane." (DSOMF at ¶ 15; Pls.' Answ. to DSOMF at ¶ 15.) They also testified that they did not receive at least the Highway Occupancy Permit required by the original conditional land development approval until after the instant lawsuit was filed. (*See* Edward Button, Sr. at 17:25-18:8; Sandra Button Dep. at 11:24-12:6). Thus, notwithstanding Plaintiffs' conclusory denials, the record shows that the Plaintiffs were not in fact in compliance with all of the required conditions of their 1991 land development approval at the time Snelson began his

enforcement activities. The fact that it took seventeen years for Snelson to point out their

deficiency does not expose him to constitutional liability; it only shows that he corrected a

long-overseen error. By following the letter of the law and not allowing Plaintiffs to make

some type of laches argument, Snelson acted in accordance with the Municipalities

Planning Code, which requires that zoning officers "administer the zoning ordinance in

accordance with its literal terms, and shall not have the power to permit any construction or

any use or change of use which does not conform to the zoning ordinance." 53 Pa. Cons.

Stat. Ann. § 10614.

Indeed, Plaintiffs do not argue that their proposed propane storage use was

authorized by the 1991 land development approval, but only that they "are not required to

obtain land development or zoning approval from Dorrance Township in order to store

propane within the Zoning District in which the Blue Ridge Truck Stop exists." (Pls.' Answ. to

DSOMF at ¶ 15.) However, an analysis of the reasons they offer for this conclusion shows

multiple deficiencies.

For one, Plaintiffs argue that "Snelson's actions in attempting to regulate the storage

of propane and undertaking enforcement are clearly preempted by state law." (Pls.' Br. in

Opp. at 13.) This argument comes from the Pennsylvania Propane and Liquefied Petroleum

Gas Act, which provides that "[t]he Commonwealth specifically reserves the sole right and

ability to regulate any and all matters related to the operation of the Liquefied Petroleum

Gas Industry in accordance with this act." 35 Pa. Cons. Stat. Ann. § 1329.15(a). Plaintiffs

highlight subsection (b)(3) of that statute: "Except as provided in this subsection, a

municipality may not prohibit or otherwise regulate the use or storage of LPG [Liquefied

Petroleum Gas], including the location or replacement of storage tanks for LPG." *Id.* at §

1329.15(b)(3).

Plaintiffs do acknowledge the immediately preceding subsection (b)(2), which

appears fatal to their argument. This subsection explicitly authorizes the types of municipal

zoning regulations of propane storage that are at issue in this case, as follows:

> A municipality shall retain the right pursuant to local zoning ordinances to
> require any LPG facility to locate within approved residential, industrial,
> commercial or other zones *and to require an LPG facility to obtain zoning
> permits, pay zoning fees and undergo inspections related to the zoning of the
> LPG facility.* Any building at an LPG facility shall comply with the municipal
> standards applied to primary structures.

*Id.* at 1329.15(b)(2) (emphasis added). Nonetheless, Plaintiffs believe that (b)(2) is rendered

inapposite by the case *JoJo Oil Co., Inc. v. Dingman Township Zoning Hearing Board*, 77

A.3d 679 (Pa. Cmmw. Ct. 2013). *JoJo* held that, while subsection (b)(2) "specifically

recognizes a municipality's right to perform its traditional zoning function to restrict the zone

in which bulk fuel transfer station may be located, it does not permit a municipality to restrict

location based on its determination that such a facility is inherently dangerous." *JoJo*, 77

A.3d at 691. Plaintiffs then triumphantly point to page 6 of Snelson's seven page *ex parte*

correspondence to Magisterial Judge Swank, where he wrote, in the context of his demand

for damages, under the heading "A Deterrent of Future Violations:"

29

Given the complexity and dangerous nature of the bulk storage of propane the Township will need to be ever diligent that the safety concerns of its residents are met. Therefore Dorrance Township requests an award of $1000 as a deterrent for future violations.

(Pls.' Br. in Opp. at 15 (quoting Pls.' Appendix at 39a).) Thus, according to Plaintiffs, Snelson sought to engage in "precisely" the kind of activity that *JoJo* recognized as preempted. (*Id.*)

This argument is too clever by half. While it is possible to find one quote where Snelson appeared motivated by propane's "inherent danger," the record taken as a whole clearly indicates that this was not the purpose of these enforcement proceedings. Rather, the evidence of record shows that the Township acted against the Buttons for the simple fact that they did not have the proper permits and approvals. For example, the November 18 Cease and Desist Letter began: "You have not received any approval for the operation of a propane installation from Dorrance Township. Therefore within 5 days; remove any and all propane containers that have been filled with propane at any time." (*See* Defs.' Appendix at 4a.) The subsequent correspondence between Dean and Snelson, as well as the Buttons' attempts at reaching an agreement with the Township, all revolved around obtaining the correct permits and approvals. (*See generally* pp. 6-13, *supra*.) The violations ultimately listed in the Enforcement Notices all concerned zoning and land development ordinances and Snelson wrote to the Buttons that they could remedy the violations by obtaining the correct zoning and land development permits and approvals. (*Id.* at 10.) Even the letter to Judge Swank, from which Plaintiffs selectively quote, begins by asserting the Township's

30

desire "to bring Edward and Sandy Button into compliance with the requirements of the

Dorrance Township Zoning Ordinance and the Dorrance Township Sub Division and Land

Development Ordinance." (Pls.' Appendix at 34a.) Thus, the record clearly shows that

Defendants' actions here were not motivated by attempts to regulate propane's "inherent

danger," but rather by standard zoning policies excepted from preemption by section

1329.15(b)(2).

Given that these actions were not preempted, the next logical question is whether

Snelson was legally authorized in acting as the Dorrance Township Zoning Officer to require

zoning and land development approval for propane storage facilities. A review of the

relevant Ordinances shows that the answer is clearly "yes."

As to zoning approval, section 301 of the Zoning Ordinance provides that "[n]o

structure or land shall be used or occupied, and no structure or part of a structure shall be

erected, demolished, altered[,] converted or moved, unless in compliance with all applicable

provisions and regulations of this Ordinance." (Defs.' Appendix at 149a.) Article 5 of the

Zoning Ordinance provides a classification of different zoning districts based on the uses of

different properties. Section 506, entitled "B-2 – Highway Business District," covers retail

businesses "including or similar to," *inter alia*, "convenience stores with gas sales." (*Id.* at

171a.) Businesses falling in the B-2 category are "prohibited" under section 506.3 from

"[a]ny use which utilizes and/or stores any hazardous substances as defined in Article 2 of

this Ordinance." (*Id.* at 172a.) Article 2 defines "hazardous substances" as:

31

Any material that, by reason of its quantity, concentration, or physical, chemical or infectious characteristics may:

    1.  cause, or significantly contribute to, an increase in mortality or an increase in a serious irreversible or incapacitating irreversible illness.

    2.  pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of or otherwise managed.

This definition shall be deemed to include radioactive material, medical waste and any incendiary device and/or explosive device or material.

(Id. at 132a-33a.) Given these definitions, it was certainly reasonable for Snelson to conclude that propane was a "hazardous substance" not permitted in a B-2 Zoning District.

Of course, it is also true that the Zoning Hearing Board later granted the Plaintiffs' petition for a variance and allowed propane storage at the premises as a nonconforming use. (See p. 11, supra.) We assume that this decision, whatever its actual legal merits, settled the zoning portion of this dispute, as no one ever challenged it. Thus, further efforts by Snelson to require zoning permits specifically after the Hearing Board's August 30, 2011 decision would have been improper as conflicting with that decision. However, this does not advance the Plaintiffs' case, because even if zoning approval was completed, Snelson was still authorized to pursue the land development approvals, which remained outstanding.

As to land development approval, section 315 of the Dorrance Township Zoning Ordinance lists several land uses classified as "land development" that require additional approval beyond zoning approval, pursuant to the Dorrance Township Subdivision and Land Development Ordinance. (See Defs.' Appendix at 152a.) These include "[a]ny nonresidential use of land, with or without structures, which encompasses five (5) or more acres of land,

32

excluding agricultural use of land." (*Id.* at 153a.) The Subject Property was a nonresidential

business, which, Sandra Button testified, encompassed 11 acres of land. (Sandra Button

Dep. at 5:20.) As we have had occasion to repeat several times above, the Buttons admit

that they did not apply for land development approval until after this case was filed. (*See,*

*e.g.,* p. 13, *supra.*) Therefore, the record indicates that the Buttons were in violation of the

Township's land development requirements at the time Snelson began contacting them.

It will be noted that in discussing these matters, we only conclude what the record

"indicates" and not whether Snelson was in fact correct that the Plaintiffs' land use violated

the relevant ordinances. In establishing their substantive due process claim, Plaintiffs must

show that Snelson's actions "shocked the conscience;" mere negligent enforcement of his

job duties is insufficient to advance their claim. *See Miller*, 174 F.3d at 376. Because the

record shows that Snelson had ample legal justification to pursue the actions he did, then

no triable issue of fact exists as to Plaintiffs' claim. This would be true even if the Plaintiffs

could show that Snelson misapplied the ordinance. All a misapplication would show is that

Snelson was negligent or reached an erroneous conclusion. But making a mistake when

that mistake appears facially reasonable given the existing ordinances does not shock the

judicial conscience and therefore bars a substantive due process claim

### 2.  Notice Procedures

Second, Plaintiffs argue that Snelson violated the procedures in the Pennsylvania

Municipalities Planning Code, set forth at 53 Pa. Cons. Stat. Ann. § 10616.1. (*See* Pls.' Br.

in Opp. at 7-8.) Section 10616.1(a)-(b) provides that the Township must send an enforcement notice to the owner of any parcel of land on which it believes a zoning violation has occurred. Subsection (c) then lists various types of information that must be included in that notice.

While Plaintiffs complain that Snelson did not follow the notice provision of the Municipalities Planning Code, it is unclear exactly how they believe he erred. As best the Court can glean from Plaintiffs' submission, it appears that they believe that Snelson's error was in "exercise[ing] self-help or undertak[ing] summary action" when he "sen[t] the 'Cease and Desist Order, dated November 18, 2010, in which he directed that all propane operations be shut down, without benefit of notice or hearing." (*Id.* at 10.)

This argument is meritless. The Cease and Desist letter did not "initiate enforcement proceedings" under section 10616.1(a); it merely warned the Plaintiffs that the Township considered them to be in violation of the zoning ordinance and directed that they cease all such violative activity. (*See generally* pp. 5-6, *supra.*) The Court is aware of no authority holding that a party is entitled to "notice or hearing" before they receive such a Cease and Desist Letter. Indeed, since the Letter is itself a type of notice regarding the perceived violations, requiring notice to provide this notice is absurdly duplicative. Suffice it to say that, when Snelson finally did initiate enforcement proceedings, he sent an official Enforcement Notice as provided in the Municipalities Planning Code. (*See id*. at 10.) The Plaintiffs have provided nothing to show that that notice was in any way deficient.

Moreover, even if Plaintiffs believed that the notice they received was procedurally deficient, the Municipalities Planning Code provides a procedure to correct these deficiencies. The three Enforcement Notices that Snelson sent complied with 53 Pa. Cons. Stat. Ann. § 10616.1(c)(5) by notifying the Buttons that they had the right to appeal the notice to the Zoning Hearing Board. (See Defs.' Appendix at 16a, 75a, 80a.) Indeed, Pennsylvania law gives the Hearing Board "exclusive jurisdiction" to "hear and render final adjudications" on exactly these types of appeals. See 53 Pa. Cons. Stat. Ann. § 10909.1(a)(3). But the record shows that the Plaintiffs never took advantage of these state-law remedies, choosing instead to only file a petition for a zoning variance, which, at most, only had the potential to address some of the violations alleged in the Enforcement Notices. At this late stage, Plaintiffs cannot plausibly argue that they were deprived of due process when they had opportunities to pursue remedies for their alleged deprivations at the state-law level, but neglected to do so.

### 3. State Court Litigation

Third, Plaintiffs take issue with the civil action that Snelson filed with before Magisterial Judge Swank in Pennsylvania state court. (See, e.g., Pls.' Br. in Opp. at 17.) They begin by arguing that the entire civil litigation was inappropriate because the Zoning Hearing Board had not issued its decision at the time that Snelson filed the civil complaint. (See id.) Purportedly, the Plaintiffs believe that Snelson should have waited for a zoning

35

decision before taking the law into his own hands and bringing the case before a Magisterial

Judge.

The Court agrees that certain facts of record do show that Snelson acted somewhat

inappropriately during these proceedings. That is, there is an ambiguity as to whether he

filed this case in his personal capacity, despite the fact that he would have no standing to do

so. (See footnote 7, supra.) There is also an ambiguity about whether he properly got

authorization from the Township Solicitor and followed the appropriate legal channels before

initiating this lawsuit on his own, as a layman. (See p. 14, supra (Schneider noting that he

"never would have allowed [the civil complaint] to be filed").) However, as discussed above,

there is no question that, despite the pendency of the Zoning Hearing Board petition at the

time that Snelson initiated suit, issues would remain for resolution no matter what decision

the Hearing Board reached. The Hearing Board was only presented with a request for a

variance from the zoning ordinance, whereas, the land development approvals were wholly

separate from the zoning matters. Thus, Snelson did not exceed his authority in pursuing

these pending other matters simultaneous to the zoning petition, even if we assume at the

summary judgment stage that he did not follow correct legal procedures in doing so.

Snelson's other improprieties during the civil litigation merit the same analysis. It was

undoubtedly improper for Snelson to contact the presiding judge by an ex parte

communication. It was also improper for him to attempt to assess costs against the Plaintiffs

for which he had no legal authority. However, given that the Buttons ultimately prevailed at

the Magisterial Judge's hearing and all of Snelson's claims were defeated, these

improprieties caused the Plaintiffs no prejudice. Nor can they be said to "shock the

conscience." We have already explained above that not every negligent misstep constitutes

a federal cause of action. These errors, which occurred during the course of a complicated

multi-year land-use dispute, are not enough by themselves to transform this dispute over

local zoning ordinances into a constitutional cause of action.

### 4.  Miscellaneous Improprieties

Finally, Plaintiffs offer several other miscellaneous examples purporting to show that

"Snelson took the law into his own hands and substituted his own rules for the criteria of

law." (Pls.' Br. in Opp. at 11.) They make much of their claim that Snelson directed that "all

propane operations" be shut down. (*Id.* at 10.) They also take issue with the facts that

"Snelson appeared at the premises and indicated to an employee, [Diane] Gross, that the

Premises was not in compliance and should be closed" and that he "posted the Premises

with copies of the 'Cease and Desist Order.'" (*Id.* at 11.) They also note that Attorney

Schneider testified that he believes Snelson wanted "to close" the Buttons' business. (*Id.* at

17.)

In making this argument, Plaintiffs rely heavily on equivocation. Thus, they describe

the Cease and Desist Letter as "directing that *all operations* be shut down at the Premises,"

(*id.* at 11), even though at another point of their brief they describe it as directing only "that

all *propane* operations be shut down," (*id.* at 10) (emphases added). In doing so, they

suggest that the Cease and Desist Letter sought to put Plaintiffs out of business entirely. But in fact, a neutral reading of that Letter shows that it only concerned ending activity not permitted by the Dorrance Township Ordinances, and did not affect any *permitted* activity occurring at Button Oil. (*See* pp. 5-6, *supra*.) As Plaintiffs do not have a right to conduct activities that violate Township Ordinances, Snelson had every right to demand that they cease what he perceived to be unpermitted activity. Moreover, even if he wanted to close the Premises entirely, as Plaintiffs believe his conversation with Gross and Schneider's testimony indicate, it is clear from the record that his subjective intention was never manifested in any objective measures of record taken under the color of state law.

For all of the above reasons, the Court will grant summary judgment in favor of Alan Snelson.

### b. Qualified Immunity

Snelson also claims qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Qualified immunity serves the dual purpose of holding government officials accountable when they exercise power irresponsibly and protecting officials from "harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"[Q]ualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 1295, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting)).

In deciding whether to grant qualified immunity, the Court must consider two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*

Here, the qualified immunity analysis is the same as the due process analysis. The most favorable interpretation of the facts of record does not reflect any constitutional violation. Therefore—though the point is largely academic—Snelson is entitled to qualified immunity in addition to receiving a favorable judgment.

### c. Claim against Dorrance Township

As the Court noted above, nowhere in the Complaint or in any of their summary judgment submissions do the Plaintiffs specify the basis by which they seek to hold Dorrance Township liable. This is troubling because, under section 1983, "a municipality cannot be liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Department*

*of Social Services*, 436 U.S. 658, 692, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).

Rather, if Snelson were liable as a tortfeasor, then Plaintiffs would still have to "demonstrate

that, through its *deliberate conduct*, the municipality was the 'moving force' behind the injury

alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405, 117 S. Ct.

1382, 1389, 137 L. Ed. 2d 626 (1997). This may be shown through "proving a government

policy" or a custom whereby "a given course of conduct, although not specifically endorsed

or authorized by law, is so well-settled and permanent as virtually to constitute law."

*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

Here, Plaintiff has not attempted to show any of this. As such, we can only assume

that Plaintiffs intend for the Township's liability to flow up from Snelson's alleged misdeeds:

exactly the type of *respondeat superior* liability that *Monell* precluded. Summary judgment

on behalf of the Township is warranted on this basis alone. However, even if we construed

Plaintiffs' claim against the Township as a *Monell* claim that predicates liability on the

Township's promotion of an unconstitutional custom, the record still shows no evidence of

unconstitutional conduct by anyone, let alone evidence of an unconstitutional custom. Thus,

a *Monell* claim would fail as well.

The Court will accordingly grant summary judgment in favor of Dorrance Township.

## V.    Conclusion

For the foregoing reasons, the Court will **GRANT** Defendants' Motion for Summary

Judgment (Doc. 39) and **DENY** Plaintiffs' Motion for Summary Judgment (Doc. 34). A

separate Order follows.

Robert D. Mariani
United States District Judge